529 So.2d 34 (1988)
STATE of Louisiana in the Interest of A MINOR MALE CHILD[1].
No. 87 CJ 1687.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
*35 Jacqueline Joubert, Baton Rouge, for plaintiff/appellant.
William LePore, Hammond, for mother.
Jean S. Robertson, Hammond, for father.
Before WATKINS, CARTER and FOIL, JJ.
CARTER, Judge.
This is a suit by the State of Louisiana Through the Department of Health and Human Resources (Department) to terminate the parental rights of the parents of a minor male child.

FACTS
The minor child was born on August 1, 1983, to an unmarried couple who were living together. The child was subsequently placed in the custody of the Department pursuant to LSA-R.S. 14:403 following certain incidents endangering his health and safety.
In February, 1984, the child was hospitalized for "chylous ascites" (a condition which resulted from the failure of his body to process fats) and "failure to thrive." He was placed on a special dietary formula and discharged to his parents at a weight of over nine pounds.
During the following year, the child's parents failed to provide the minor child with the necessary amounts of the special dietary formula and the proper medical care. The child missed numerous medical appointments at the local pediatric clinic, and his parents consistently failed to pick up the special dietary formula, which was provided at no charge.
On October 9, 1984, the mother brought the minor child to the local pediatric clinic, stating that the minor child was spitting up.[2] At that time, the child was fourteen months old and weighed a little over eight pounds. The mother was told to immediately take the child to the emergency room of the local charity hospital. The child was taken to the hospital the following day. He was transferred to New Orleans Charity Hospital. After examination, hospital personnel determined that the child had multiple abrasions around his eyes and neck, a bruise on his neck and a subdural hematoma.[3] Upon admittance, the child could not walk, crawl, or turn over and responded only to intense pain. He also flinched when anyone approached him. While hospitalized, the child was treated with subdural taps for seven to ten days.
Thereafter, the physicians determined that the child needed surgery. Despite numerous efforts, the hospital was unable to contact the parents.[4] On October 24, 1984, the child was placed in the custody of the Department pursuant to LSA-R.S. 14:403. *36 Following a hearing, the child was adjudged "in need of care" on November 8, 1984, and custody in the Department was continued. The child was then able to have the surgery necessary for placement of a subdural peritoneal shunt.
On December 5, 1984, an adjudication hearing, which both parents attended, was held, and the court placed the child in the custody of the Department's foster care program. He was released from the hospital and placed in a foster home where, within six months, he had gained weight, was alert and could sit up, turn over and use a walker. Thereafter, reviews were conducted approximately every six months to determine whether the minor child could be returned home to his parents or must remain in the custody of the Department.
In November, 1986, the Department filed a Petition for Termination of Parental Rights. After a hearing, the trial court terminated the mother's parental rights, but refused to terminate the father's parental rights. From this judgment, the Department appealed, assigning as its sole assignment of error the failure of the trial judge to terminate the father's parental rights.[5]

TERMINATION OF PARENTAL AUTHORITY
The State proceeded pursuant to LSA-R.S. 13:1601(B),[6] which sets forth the elements necessary for termination. LSA-R.S. 13:1601(B) provides as follows:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsections A, B, C, D, E, or F, of this Section. The district attorney may appoint any attorney representing the Department of Health and Human Resources as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
These elements "must be proven by clear and convincing evidence." LSA-R.S. 13:1603(A); State in the Interest of J.K.F., 481 So.2d 194 (La.App. 1st Cir.1985). Additionally, it must be proven "that the best interest of the child dictates termination of parental rights." LSA-R.S. 13:1602(D); State in the Interest of a Minor Male Child, 461 So.2d 1278 (La.App. 1st Cir. 1984). The trial court held that requisite burden of proof had not been met. We disagree.
As we address each element, we find that the Department has fully satisfied its burden of proving each of the elements in subsection (B) as follows:
(1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
LSA-R.S. 13:1601(B)(1) has a two-prong analysis. First, more than one year must have elapsed since the child was adjudged to be abused, neglected or in need of care. *37 Second, the parent must be determined to be unfit.
a. One year since rendition of judgment
The record clearly reflects that a judicial order was rendered on November 8, 1984, finding that the child was in need of care. The instant proceeding to terminate parental rights was instituted two years later.
b. Parent is unfit to rear the child
"Unfit" as defined by LSA-R.S. 13:1600(6) refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health, moral, or emotional well-being is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights; or
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
While subsections (a) and (b) appear to address only intentional actions of a parent, it has been held that they also include passive conduct that results in harm to the child. State in the Interest of C. V. v. T. V., 499 So.2d 159 (La.App. 2nd Cir.1986), writ denied, 500 So.2d 411 (La.1986).
In the instant case, we find that the record does not support a finding of actual physical abuse by the child's father under LSA-R.S. 13:1600(6)(a). However, there is sufficient evidence to find that he consistently failed to provide reasonably necessary food and/or medical services to the child. LSA-R.S. 13:1600(6)(b).[7]
Both the mother and father were informed of the child's medical condition in February of 1984, and the need for the child to be kept on a special formula and attend regular check-ups. Despite this fact, during the next eight months, the parents continued to miss numerous appointments and often failed to pick up the free formula. Although the parents indicated compliance with the diet to health officials, the child's poor growth and weight gain indicated that the child was not receiving adequate nutrients. This is supported by the fourteen-month-old child's weight of approximately eight pounds on October 9, 1984 (a loss of almost a pound during the eight months following his discharge from the hospital in February of 1984).
A report prepared by Macel Bourgeois, a registered nurse with the Tangipahoa Parish Health Unit, stated that prior to the child's hospitalization in October of 1984, the parents appeared affectionate and caring, but they consistently failed to follow through with proper care and medical review. The comments of Susan Quinn, the nutritionist with the health unit, were contained in Ms. Bourgeois's report and indicated that the parents stated they understood and complied with the low fat diet order. However, her subsequent contact with the parents showed lessening compliance and failure to follow through on dietary instructions, which was evidenced by the child's poor growth and poor weight gain. In the nutritionist's opinion, strong evidence of neglect was supported because the child's special formula was provided in adequate amounts at no cost. The records indicated that the parents often simply failed to pick up the special formula.
*38 A report from Dr. Charles Welborn, the pediatrician at the local health unit, stated that his most impressive finding outside of his medical diagnosis was the apparent unconcern of the child's family. After the child missed two appointments at the health unit, he asked Child Protective Services to investigate. Only then did the child's mother bring him in for an evaluation. After examining the child on October 9, 1984, he felt that the child was a "classic example of child neglect and probable child abuse." He termed the child's condition "appalling" and recommended that the child never be returned to his natural parents.
The father testified that he thought the baby was too small, but relied on the mother's statement that the baby was all right. We do not feel that the child's physical condition can be blamed entirely on the mother. While the father was employed and working throughout the time the child was in his custody, he also had a responsibility to see that the child received proper care. The fact that the child was not getting that care had to be apparent to him in light of the physical condition of the child on October 9, 1984.[8]
The father testified that he knew the mother spanked the child, but he took no overt action to prevent the whippings other than to ask her to stop or to ask the child's grandmother for help. We find that the State has proven by clear and convincing evidence that the child's father is unfit for consistently failing to provide the necessary care, food and medical services to the child and for his passive conduct which caused harm to the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
After the minor child was adjudicated a child in need of care, the Department worked with the mother and the father to reunite the child with his family and to improve the parents' skills in an effort to return the minor child to his family. In December of 1985, the father submitted to a psychological evaluation by Fred L. Tuton, Clinical Psychologist, which revealed that the father had possible minimal brain injury and poor parenting skills and was a high risk for abuse and neglect. Prior to the termination hearing, the psychologist again evaluated the father and reported that the father's overall functioning had not appreciably changed from his two prior evaluations and that adoption was in the child's best interest. He further reported that the father's prognosis to make any appreciable changes to meet the minimal needs of the child was extremely poor. Further, both parents initially refused parenting classes, and neither visited with the child on a regular basis. In June of 1986, the father began visiting the child more frequently, but failed to attend the parenting classes. The father began to attend parenting classes in September of 1986, but irregularly visited the child.
While we acknowledge that the child's father eventually began to show an interest in the child and to visit on more regular occasions, he did not attend any parenting classes until September, 1986. Even after some classes, the psychologist was still of the opinion that his overall functioning had not changed and that the prognosis of the father ever making any appreciable changes to meet the minimal needs of his child were extremely poor. The only evidence presented to contradict the psychologist's report was the father's statement that he could care for the child.
We find that the Department has proven by clear and convincing evidence that the child's father has shown no substantial indication of reformation and is unlikely to reform. It is settled jurisprudence that in cases involving the custody of children, the primary concern is the welfare and best interest of the children, and this consideration must prevail over the parental right to custody in cases where the two principles conflict. State in the Interest of B.C., 483 So.2d 1137 (La.App. 5th Cir.1986).
In the instant case, the psychologist, the child's treating physicians, and the social workers all felt that adoption was in the *39 best interest of the child and that the child should not be returned to his natural parents. The best interest of the child is of paramount importance. State in the Interest of C.V. v. T.V., supra. We recognize that termination of parental rights is a severe remedy. However, the father's past performance and poor prognosis for future performance leaves no doubt that he cannot properly care for this child.
We have carefully reviewed the entire record in the instant case and find that the trial judge was clearly wrong in refusing to terminate the father's parental rights. While the judge may have been moved by the father's testimony at the hearing, he erroneously found that the Department failed to carry its burden of proving the elements necessary for termination under LSA-R.S. 13:1601(B). Indeed, the Department presented overwhelming evidence to prove each and every element of LSA-R.S. 13:1601(B), and the evidence unequivocally established that adoption was in the best interest of the minor child.

CONCLUSION
For the reasons cited above, the decision of the trial court is reversed, and judgment is rendered, terminating the parental rights of the child's father. Costs of this appeal are assessed against the father.
REVERSED AND RENDERED.
NOTES
[1] This case has been recaptioned to preserve the confidentiality of the parties.
[2] Dr. Charles A. Welborn, who provided pediatric services at the local clinic, requested an investigation by Child Protective Services when the minor child missed two appointments. It was only then that the child's mother brought the child into the clinic for evaluation.
[3] The mother explained that the baby fell off of a bed and another child grabbed him around his neck. However, her statements were discredited following investigation by the Social Services worker and the statements of the examining physician.
[4] The child's mother left the child in the hospital on about October 16, 1984, and did not return to visit the child or call to check on his condition. The child's father testified that he visited the child on one occasion while the mother was there.
[5] The portion of the trial court judgment terminating the mother's parental rights was not appealed and is now final. Any discussion in this opinion specifically addresses only the father's parental rights.
[6] The petition for termination filed by the Department also requested termination under LSA-R.S. 13:1601(D) and (F). However, the Department need only prove the grounds under one subsection. See State in the Interest of B.C., 483 So.2d 1137 (La.App. 5th Cir.1986); State in the Interest of a Minor Male Child, 461 So.2d 1278 (La.App. 1st Cir.1984).
[7] At trial, the evidence consisted of the testimony of Linda Taylor, the family services worker; Angela Milazzo, the crisis intervention and foster care worker; and the child's father, as well as all the reports and records of the Department concerning the care of the minor child.
[8] He did testify that he was responsible for getting the child to the doctor on that date.