CARTER, Judge.
This is an appeal from a trial court judgment terminating a mother’s parental rights.
FACTS
On July 2, 1983, CA, a female child, was born to Ms. A. Ms. A’s husband was not the father of the child, but another man, now deceased, was the child’s father.[2]
On May 9, 1989, pursuant to an instanter order, CA was taken into the custody of the Office of Community Services (OCS). The affidavit in support of the instanter order indicated that, during 1988, OCS in St. Tammany Parish received various reports of neglect and sexual abuse of CA and that Ms. A may be schizophrenic and may be incapable of parenting and/or protecting the minor child. The affidavit further indicated the following:
Based upon the investigation and psychiatric evaluations, ... [Ms. A] has placed her daughter in danger of repeated sexual abuse, deplorable living conditions and an inability to provide a stable, safe and sanitary environment for ... [CA]. The danger of the child is increased by the worker’s and Dr. Ramos’s observations that because of [Ms. A’s] mental state, she has no insight as to how her lifestyle places ... [CA] at risk, fails to accept any responsibility for her problems and appears to lack motivation to improve or change her situation. If ... [CA] should be returned to her mother she will continue to be neglected and in this manner be placed at risk of further sexual abuse.
On June 21, 1989, CA was adjudicated a child in need of care. Following a disposi-tional review hearing on April 27, 1990, the court determined that reasonable efforts had been made to reunite the family and that reunification was not possible at the time. The court then ordered that CA be maintained in the custody of OCS and approved the plan to proceed with terminating the parental rights.
On August 16, 1990, a petition for termination of parental rights was filed pursuant to LSA-R.S. 13:1601B and D. On August 7, 1991, following a dispositional review hearing, the court determined that reasonable efforts had been made to reunite the family and that reunification was not possible at that time. The court further determined that CA should be maintained in the custody of OCS with a permanent plan for adoption.
On January 24, 1992, following another dispositional review hearing, the court again determined that reasonable efforts had been made to reunite the family and that reunification was not possible at that time. The court further determined that CA should be maintained in the custody of OCS with a case goal of adoption pending the termination of parental rights.
Thereafter, on March 5, 1992, a hearing on the termination of parental rights was held. On April 10, 1992, the trial court rendered judgment totally and irrevocably terminating and dissolving the parental *902 rights of Ms. A relative to the minor child, CA.
From the judgment terminating her parental rights, Ms. A appeals, assigning as error the trial court’s termination of her parental rights absent clear and convincing evidence that she would not be able to return to fitness as a parent.
LAW
LSA-R.S. 13:1601[3] provides several subsections containing requirements for the termination of parental rights. The evidence need only satisfy the requirements set forth under any given subsection. State in the Interest of JH and SEH v. RFH and TH, 572 So.2d 629, 631 (La.App. 3rd Cir.1990), writ denied, 575 So.2d 374 (La.1991); State in the Interest of CAM and AAM, 565 So.2d 523, 526 (La.App. 3rd Cir.1990); State in the Interest of Townzen, 527 So.2d 579, 580 (La.App. 3rd Cir.1988), writ denied, 535 So.2d 739 (La.1989).
LSA-R.S. 13:1603[4] provides that the elements of Subsections B and D must be proven by clear and convincing evidence. Additionally, it must be proven “that the best interest of the child dictates termination of parental rights.” LSA-R.S. 13:1602D; State in the Interest of JH and SEH v. RFH and TH, 572 So.2d at 631; State in the Interest of CAM and AAM, 565 So.2d at 526; State in the Interest of a Minor Male Child, 529 So.2d 34, 36 (La.App. 1st Cir.1988).
The Department proceeded to terminate Ms. A’s parental rights pursuant to LSA-R.S. 13:1601B[5] and D,[6] which provide as follows:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court’s jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, E, or F of this Section. The district attorney may appoint any attorney representing the Department of Health and Human Resources as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
[[Image here]]
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2)The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
[[Image here]]
D. (1) The child has been in the custody of a child welfare department or other person, pursuant to a judicial order, for a period of at least one year.
(2) The child was removed from the custody of the parents by judicial order due to the parent’s abuse or neglect of the child.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
(4) The child is an abused or neglected child, the Department of Health and Human Resources has made every reasonable effort under the circumstances to reunite the child with his parents, and the department recommends that it would not be in the best interest of the child to be reunited with his parents.
*903 PROCEDURAL REQUIREMENTS
LSA-R.S. 13:1601B(1) and 1601D(1) and (2)
The record contains the judgment of the trial court rendered on June 21, 1989, pursuant to the Code of Juvenile Procedure, finding that the minor child, CA, was in need of care, abused, or neglected and that the child was adjudicated in need of care. Legal custody of CA was assigned to the Department of Health and Human Resources, Office of Community Services. The petition for termination of parental rights was filed on August 16, 1990. Consequently, more than one year had passed between the rendition of the in-need-of-care judgment and the filing of the petition for termination of parental rights.
PARENTAL FITNESS
LSA-R.S. 13:1601B(1) and 1601D(3)
In order to terminate parental rights under LSA-R.S. 13:1601B(1) and/or LSA-R.S. 13:1601D(3), the court must be of the opinion that “the parent is unfit to rear the child.” Unfitness is defined in LSA-R.S. 13:1600(7)[7] as follows:
Unfit refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health, moral, or emotional well-being is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenents of a well organized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights; or
(c)Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
LSA-R.S. 13:1600(7)(a)
This subsection has been held to include passive conduct that results in harm to the child. State in the Interest of TK, ADT and BPT, 568 So.2d 636, 640 (La.App. 3rd Cir.1990); State in the Interest of CAM and AAM, 565 So.2d at 528; State in the Interest of HLD v. CDM, 563 So.2d 360, 364 (La.App. 3rd Cir.1990); State in the Interest of C. V. v. T. V. and S. V., 499 So.2d 159, 164 (La.App. 2nd Cir.), writ denied, 500 So.2d 411 (La.1986).
In the instant case, Ms. A clearly allowed other people to abuse CA. OCS validated sexual abuse against CA by numerous people. Donna Cohen, OCS child protection investigator, testified that her office received four complaints beginning in July of 1988.[8] The substance of these complaints was that CA had been sexually molested repeatedly and that she was not being cared for properly. According to Cohen, the 1988 investigation lead to a determination that the complaints were valid. Because of the mother’s lack of supervision, CA had repeatedly been sexually abused by numerous persons.
Ginger Pine, OCS supervisor, supervised Donna Cohen’s investigation in July, 1988, when the agency began receiving referrals on Ms. A. Pine interviewed the five-year-old child, CA, in September, 1988. When Pine questioned CA regarding the sexual abuse, CA began acting out, became very angry and began running around the room, and was very difficult to interview. In using the anatomically correct dolls to demonstrate the alleged abuse, CA ripped the *904 dolls’ clothes off and showed them having intercourse. The child was eventually able to be interviewed about the sexual abuse and indicated to the social workers that she had been sexually molested by a teenage boy.
Lynn Folse, family service worker for OCS, became involved in the matter of Ms. A and CA in February of 1989, after Donna Cohen, and remained the social worker through June of 1989. When Folse discussed the sexual abuse of CA with Ms. A, Ms. A indicated that she never let CA out of her sight, that she had not married because she did not want men to sexually abuse the child, that she did not work because she wanted the child with her, and that she wanted to protect the child from sexual abuse. This indicated to Folse that the child had been sexually abused, and Ms. A’s protestations of preventing the sexual abuse were in stark contrast with the mother’s actions. Ms. A’s older daughter indicated to Folse that CA revealed that one of the persons who had sexually molested her was a hippie-friend of Ms. A, in whose care Ms. A had left CA. Moreover, Folse testified that she did not believe that Ms. A could protect CA from future sexual abuse because of Ms. A’s own sexual abuse as a child, the number of times Ms. A had been raped, and the manner in which Ms. A portrayed herself as a victim. Moreover, Ms. A indicated to Folse that men needed to be protected from CA because the child would “come onto” the men. Folse testified that she was concerned that the mother’s blaming the five-year-old child for sexual molestation indicated that the child would be in danger with her mother.
Judy Frish, caseworker at the St. Tammany office of OCS, worked on the case of CA from June, 1989, until January, 1990. Thereafter, she supervised the case of CA. Frish described Ms. A’s conduct at the family conference, which had been held in October, 1989. Frish testified that when the issue of sexual abuse came up, Ms. A became very agitated and called the child, who was between two and five years old, “a lying bitch.” Ms. A further indicated to Frish that she had to protect men from CA rather than protect CA from men. One of the perpetrators known to Ms. A accompanied Ms. A on one of the visits with CA, which upset the child.' Frish testified that this incident evidenced Ms. A’s lack of sensitivity to the sexual abuse issue.
Clearly, there is ample evidence in the record to support a finding that CA was sexually abused and that Ms. A is unfit by her past conduct of allowing her child to be sexually abused to the extent that the child’s health and moral and emotional well-being are endangered.
LSA-R.S. 13:1600(7)(b)
There is also ample evidence in the record to support a finding that Ms. A consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services for CA.
Donna Cohen, OCS child protection investigator, testified that prior to the complaints in 1988, two other complaints had been made. One had been made on August 15, 1983, and the other had been made on February 25, 1985. Both of these complaints were based on neglect.
Cohen determined that CA was neglected in that because of “the mother’s lifestyle instability, lack of means to provide food, shelter, and clothing,” Ms. A was “unable to provide the necessary nurturing, stimulation, security, supervision, and encouragement necessary for the emotional, intellectual, psychological, and physical growth and development of CA.”
Another allegation was that the child’s food, clothing, and shelter were inadequate. The mother did not have a home for the child. During the course of Cohen’s investigation, the mother moved her residence more than three times. When CA was evaluated for sexual abuse at Children’s Hospital, Cohen noted that the child was diagnosed as having scabies and head lice. Additionally, CA was generally unkempt, and Ms. A’s personal hygiene was poor. It appeared to Cohen that Ms. A and CA would walk the highway and get handouts.
Reverend Bobby Holder, pastor of the Red Bluff Baptist Church, testified that he *905 assisted Ms. A in 1989. According to Rev. Holder, M's. A came to his church looking for assistance. Rev. Holder obtained food for Ms. A through the food bank and assisted her in locating housing. According to Rev. Holder, at the time he assisted them, Ms. A and CA were living in a trailer near his church. He described the trailer as scantily furnished and- indicated that numerous dogs were living inside. Rev. Holder testified that the trailer smelled foul and that, at one point, the trailer was without utilities.
When Ms. A could no longer reside in the trailer, Rev. Holder and two other ministers attempted to locate lodging for Ms. A. Rev. Holder described the first home located for Ms. A as not very suitable in that it did not have indoor plumbing and was in deplorable condition. However, Ms. A liked the house because of its size.
Ginger Pine, OCS supervisor, visited Ms. A’s trailer in December, 1988, to take Ms. A and CA for a psychological examination. Pine understood that the trailer was Ms. A’s and CA’s home. While there, Pine observed that there was a lot of trash and clothing strewn about the yard outside the trailer and that there was an adult dog and several puppies living beneath the trailer. Pine entered the trailer for a moment, but had to leave because of the odor emanating from within the trailer. CA showed Pine where she slept, which was a mattress on the floor in a small room. Pine also noticed numerous unpacked boxes, piles of clothes, and trash on the floor in the trailer. Although Pine did not observe any dog feces on the floor of the trailer, she indicated that the odor, which prevented her from remaining in the trailer for any length of time, smelled like fecal matter.
Lynn Folse, family service worker for OCS who became involved in the matter of Ms. A and CA in February of 1989, testified that one of the concerns she had involved the issue of cleanliness. Ms. A’s taking animals into her home created problems. At one point Ms. A was living in a pool house. The landlord there had indicated that he did not permit pets in the home. When Folse visited, there was a kitten present, which Ms. A indicated she was trying to hide from the landlord.
Folse also testified that Ms. A had difficulty in maintaining suitable living quarters. When Ms. A was living in the pool house, she indicated that she did not stay there much, but was spending a great deal of time in New Orleans. Folse had a lot of difficulty keeping track of Ms. A’s whereabouts. The day that the agency took custody of the child, Folse had to call four different places to find Ms. A and, as a result, was not able to reach Ms. A until two days later. Ms. A would call Folse from New Orleans, but would not leave a telephone number where she could be reached.
Folse also testified regarding an interview with one of Ms. A’s older children. This older child indicated that she had lived with Ms. A and CA in 1987. In describing the conditions in which they lived, the older child told Folse that they had no refrigerator. Despite this fact, Ms. A would purchase large amounts of food that would spoil. Also, Ms. A would obtain rotten food from the French Market, and, as a result, there would be fruit flies all over the house. Additionally, the older child told Folse that there were a number of animals around the house which resulted in the presence of animal feces. The older child attempted to clean the trailer by throwing away trash that Ms. A had collected; however, Ms. A would haul all of the trash back into the home indicating that it contained important papers.
Judy Frish, caseworker at the St. Tammany office of OCS, testified that Ms. A was never able to locate suitable housing for any length of time. In June, 1989, Ms. A lived in a shack in Folsom, where she paid no rent. In August, 1989, she lived with a Mr. Bennett off and on until May, 1990. In May, 1990, she lived in a house in Madisonville, but by September, 1990, Ms. A had moved to a house on Military Road, but never had utilities there. She used the residence mostly as a place to store things. After January, 1992, Ms. A lived on Jancke Street, but could not be found there very *906 often because she was always in New Orleans.
Emily Diamond, a Covington resident who had known Ms. A for over two years, testified that she assisted Ms. A in moving into a nice, three bedroom home three or four weeks prior to the termination hearing. Diamond also testified that in the two-year period she had known Ms. A, Ms. A had two different addresses, which did not include the home into which she moved in and then immediately out. Diamond visited Ms. A in her homes and could not describe the homes as clean, by her standards. Diamond described the homes as cluttered and, to a degree, free from dirt.
After reviewing the record, we find that there is ample evidence to support a finding that Ms. A consistently refused to provide reasonably necessary food, clothing, and appropriate shelter or treatment to CA, satisfying the requirements of LSA-R.S. 13:1600(7)(b).
LSA-R.S. 13:1600(7)(c)
There is also substantial evidence in the record that Ms. A’s emotional or mental deficiency, behavior, or conduct disorder, makes her unable or unwilling to provide an adequate, permanent home for CA at the present time or in the reasonably near future.
Mela Khedouri, a board-certified social worker employed at the Family Service of Greater New Orleans, worked as a counsel- or/therapist to Ms. A. Khedouri testified that she began seeing Ms. A professionally in February of 1990, and initially saw her on a weekly basis.[9] Khedouri worked with Ms. A to establish goals, including having a permanent vocation and steady employment and dealing with Ms. A’s emotional problems. However, Khedouri determined that there were several impediments to Ms. A’s parenting ability with regard to her distractibility or inability to follow through on plans. Khedouri defined “parenting ability” as the ability to provide a consistent home environment, consistent care, and the ability to meet all of the child’s medical, economical, and emotional needs. Ms. A had problems meeting the goals of consistent employment and residence, which prevented her from providing proper food and shelter for the child. Moreover, Ms. A’s insight into her problems was rather limited. In her report to OCS, dated April 4, 1990, Khedouri opined that Ms. A’s mental health problems were preventing Ms. A from being able to care adequately for CA.
Although Khedouri saw Ms. A several weeks prior to the termination hearing and noted that Ms. A had made progress from their initial meeting, Khedouri testified that Ms. A’s ability to protect her child from sexual abuse was impaired and that the child would be at considerable risk if CA was returned to her mother. Khedouri opined that the risk to the minor child was inconsistency in care because of the mother’s distractibility. However, Khedouri felt that Ms. A may become a more efficient parent with medical intervention.
Lynn Folse, family service worker for OCS, observed that the problem with Ms. A was the family’s lifestyle in that it was one of instability. Additionally, Folse felt that the mother experienced difficulty in focusing on the problems. Folse met with Ms. A to obtain a social history and to counsel her with regard to employment and vocational rehabilitation.
Folse was also present for a family team conference with Ms. A and CA on May 15, 1989. Ms. A appeared with two of her friends, Mr. Lee and Bobbie Coleman. While visiting, Ms. A often became angry and remarked that CA was not the child she-knew. She also left the room frequently. As the visit ended, Ms. A pulled out a vial of water, indicating that it was holy water from a “Father LaFrance” and voicing her intention to baptize CA. Ms. A indicated that the day was extremely significant because it was the day that Ms. A’s young son had drowned several years before and the day that she had made her communion forty years earlier. When Folse suggested that CA may not be pre *907 pared for this, Ms. A became irate and began yelling that baptism was necessary to rid the child of demonic systematic structures. CA attempted to run, and Ms. A grabbed the child and poured water over the screaming child.
Dr. Thomas Roach, psychiatrist who performed an evaluation on Ms. A and CA, testified that he examined Ms. A on January 5, 1991 and again on November 20, 1991. On January 5, 1991, Dr. Roach observed that Ms. A was very apprehensive and appeared to be in a manic state. Dr. Roach described Ms. A as a very likable, bright, and articulate person. During the interview, Ms. A gave her version of the events and supplied some compelling arguments as to why CA should be returned to her custody. Although the initial interview began somewhat pressured, as the interview progressed, Ms. A performed fairly well until the conclusion when she made various accusations against the foster father. Following the interview, Dr. Roach determined that Ms. A’s ability to parent was very much in question. This was confirmed one week later when Dr. Roach spoke with the child.
Dr. Roach diagnosed Ms. A’s condition as bipolar disorder, manic, which affects a person’s judgment and makes it difficult for one to control his or her life. Dr. Roach opined that this type of disorder would affect Ms. A’s parenting ability in that she has poor insight and judgment. According to Dr. Roach, Ms. A’s ability to handle her life and take care of important matters is limited. Dr. Roach testified that Ms. A’s judgment is very flawed and that her decision-making processes and awareness of her child’s needs are very flawed. Dr. Roach testified that, even with medication for her condition, he questioned Ms. A’s parenting ability. Moreover, Dr. Roach testified that it would be very difficult to help Ms. A with treatment because Ms. A did not think there was anything wrong.
Clearly, the evidence established that Ms. A suffers from behavioral and mental problems that render her unable to provide an adequate, permanent home for her child now or in the reasonably near future.
After considering the factors set forth in LSA-R.S. 13:1600(7)(a), (b) and (c), we find that the trial court correctly determined that the evidence clearly and convincingly established that appellant is unfit within the definition of LSA-R.S. 13:1600(7).
PARENTAL REFORMATION UNLIKELY
LSA-R.S. 13:1601B(2) AND 1601D(3)
As noted above, the evidence clearly established that Ms. A does not possess the emotional or behavioral resources to provide a safe, protective, and nurturing environment for CA.
Lynn Folse, family service worker for OCS, testified that Ms. A did not benefit from the services and counseling provided by OCS. Folse explained that Ms. A did not remain focused about the problems and went off on tangents. Ms. A also blamed everyone else for the troubles in her life. According to Folse, Ms. A had feelings of paranoia, that people were conspiring to destroy her family and had been doing so for the last twenty years.
Folse indicated that the problems, as described by Ms. A’s older child and as revealed in their investigation, were worrisome because they were the same problems for which the New Orleans agency had intervened in the 1970’s with three of Ms. A’s other children. Folse testified that the current situation was not just a difficult period that Ms. A was going through, but demonstrated a pattern of behavior. Folse testified that, although Ms. A appeared very intelligent, Ms. A’s behavior and judgment are distorted and that she could not parent the child. Additionally, Ms. A continually denied that anything was wrong. Folse did not see any rehabilitation of Ms. A during the entire time she worked with her.
Judy Frish, caseworker at the St. Tammany Parish office of OCS, testified with regard to the agency’s recommendation that Ms. A’s parental rights be terminated. *908 Frish opined that termination would be in CA’s best interest.
Bob Branson, the case worker who generally looks after the best interest of the child and sees that the proper services are provided by the agency, testified that he was assigned to the case involving Ms. A and CA in June, 1989. Branson saw the child thirty or forty times during the course of the agency’s custody of CA. He also observed the visits between Ms. A and CA on numerous occasions. Branson testified that he agreed with the agency’s recommendation of termination of parental rights. Branson felt that termination would be in CA’s best interest. He stated that returning the child to her mother would wreck the child’s life because of the CA’s strong feelings against returning to her mother and because of the strong chance of sexual abuse and neglect.
Dr. Thomas Roach, psychiatrist, opined that CA would be at substantial risk of serious harm if she were returned to her mother. He determined that Ms. A is unable to provide adequate, permanent housing now or in the reasonably near future and that her chance of improvement, even with treatment, was very slim. Dr. Roach also opined that it was in CA’s best interest to terminate Ms. A’s parental rights; however, he acknowledged that there should be continued contact between Ms. A and CA.
The expert witness and the social workers all felt that termination was in the best interest of CA and that it was crucial to the development of the child that she not be returned to Ms. A’s home. The witnesses all testified that CA will be at severe risk of being a victim of abuse, neglect, or both if returned to her mother’s custody. Ms. A’s past performance, continued denial, and poor prognosis for future performance leave no doubt that she cannot properly care for CA.
STATUS AS ABUSED OR NEGLECTED CHILD
In terminating Ms. A’s parental rights, the trial court also determined that the child was abused or neglected and in need of care and rendered judgment to that effect over one year prior to the filing of the petition for the termination of the mother’s parental rights. The term “abused child” and “neglected child” are defined in LSA-R.S. 13:1600(1)[10] and (2)[11] as follows:
(1) ‘Abused child’ is a child against whom has been inflicted physical or mental injury which causes severe deterioration to the child, including a child who has been abused sexually or a child who has been exploited or overworked to such an extent that his health, moral, or emotional well-being is endangered.
(2) ‘Neglected child’ is a child whose parent or parents, although financially able to do so, have consistently refused to provide reasonably necessary food, clothing, shelter, or medical service. No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be neglected or abused.
Considering the testimony of Dr. Roach, Mela Khedouri, and the social service workers, it is clear that CA was an abused or neglected child as defined above.
EFFORTS TO REUNITE THE CHILD WITH HER PARENT
The record is replete with instances demonstrating the efforts of OCS to reunite CA with Ms. A. Lynn Folse, family service worker for OCS, testified that once the abuse/neglect report of CA was validated, she worked with Ms. A to alleviate the problems identified and to keep the family together. Folse met with Ms. A to obtain a social history and to counsel her with regard to employment and vocational rehabilitation. Folse also referred Ms. A to parenting classes and a sexual abuse prevention workshop. Folse testified that the agency had done everything possible to reunite Ms. A and CA. After July, 1989, Folse did not work on the ease, but she testified that it was her understanding that *909 the agency had done everything in its power to reunite the mother and child. There simply had not been enough change, emotionally or mentally, with the mother to permit reunification.
Judy Frish, caseworker at the St. Tammany Parish office of OCS, testified as to the services that the agency provided. Frish testified that extensive help with transportation was provided to Ms. A for visiting with CA, for searching for employment and housing, for receiving treatment, and for undergoing evaluations. Additionally, the agency supervised all visits. The agency also provided therapy by Mela Khe-douri, which was provided by Family Services, and referrals to other appropriate agencies as needed. Although discussions with Ms. A regarding medication treatment have taken place, Ms. A consistently refused to receive medication for her psychiatric problems. With regard to specific reunification efforts, Frish testified that the agency developed a plan for Ms. A to locate housing that she could financially maintain, to find a stable source of income, and to obtain therapy to improve her parenting abilities.
Considering the above, we find that the record supports the finding, by clear and convincing evidence, that OCS made every reasonable effort under the circumstances to reunite the minor child with Ms. A and that OCS has recommended that it would not be in the best interest of CA to be reunited with her mother.
TERMINATION PROPER
A review of the elements of LSA-R.S. 13:1601B and D convinces us that the evidence unequivocally established, by clear and convincing evidence, each and every element of LSA-R.S. 13:1601B or LSA-R.S. 13:1601D, or both, and that termination is in the best interest of CA. We recognize, as did the witnesses and the trial court, that Ms. A loves her child. However, we conclude that the trial court did not err in terminating the parental rights of Ms. A with respect to CA. The evidence supporting this finding is clear and convincing.
CONCLUSION
For the above reasons, the judgment of the trial court terminating Ms. A’s parental rights to CA and freeing the child for adoption is affirmed.
AFFIRMED.

. Ms. A identified the father of the child as CL, who died on October 5, 1983.

.By Acts 1991, No. 235, the legislature repealed the provisions of LSA-R.S. 13:1600 to 1606 and enacted the Louisiana Children’s Code, effective January 1, 1992. The substance of former LSA-R.S. 13:1601 is now contained in LSA-Ch.C. art. 1015.

. The substance of former LSA-R.S. 13:1603 is now contained in LSA-Ch.C. art. 1035.

. The substance of former LSA-R.S. 13:1601B is now contained in LSA-Ch.C. art. 1015(4).

. The substance of former LSA-R.S. 13:1601D is now contained in LSA-Ch.C. art. 1015(5).

. The substance of former LSA-R.S. 13:1600(7) is now contained in LSA-Ch.C. art. 1003(10).

. The first complaint was received on July 15, 1988. A second report was received on September 14, 1988. Thereafter, two more complaints, one on October 17, 1988, and one on December 7, 1988, were received by OCS.

. Although Ms. A attended most of her therapy sessions, attendance became increasingly more difficult when Ms. A moved to a more remote location.

. The substance of former LSA-R.S. 13:1600(1) is now contained in LSA-Ch.C. art. 1003(1).

. The substance of former LSA-R.S. 13:1600(2) is now contained in LSA-Ch.C. art. 1003(8).